Marty CALDERON, Plaintiff,

v.

Chief of Police Joseph BURTON, et al., Defendants.

No. 06 CIV.2009 CM.

United States District Court, S.D. New York.

Oct. 16, 2006.

Marty Calderon, Norwalk, CT, Plaintiff Pro se.

Plaintiff Pro Se, Ossining.

Paul Svenson, Esq., Boeggeman, George, Hodges & Corde, P.C., White Plains, NY, for Defendant.

DECISION AND ORDER DISMISSING COMPLAINT WITH PREJUDICE AGAINST THE VILLAGE OF OS-SINING AND DEFENDANTS NA-POLITANO, HERNANDEZ, BOR-GIA, CHEATHAM AND HANAUER AND DENYING PLAINTIFF'S MO-TION FOR LEAVE TO FILE AN AMENDED COMPLAINT AGAINST THEM; DENYING THE MOTION OF DEFENDANT BUR-TON FOR SUMMARY JUDGMENT ON THE GROUND OF QUALI-FIED IMMUNITY AND GRANT-ING PLAINTIFF LEAVE TO FILE AN AMENDED COMPLAINT AS AGAINST HIM; GRANTING IN PART PLAINTIFF'S MOTION FOR A DEFAULT JUDGMENT AGAINST DEFENDANTS A & P COLLISION, INC. AND RAY OAK-LEY; AND ORDERING AN IN-QUEST AND A HEARING BE-FORE THE MAGISTRATE

MCMAHON, District Judge.

In this opinion, the court resolves the motion of the individual Ossining Defendants for summary judgment on the ground of qualified immunity and plaintiff's cross motions for leave to amend her complaint as against the Village of Ossining and the individual Ossining Defendants and for a default judgment against defendants A & P Collision and Ray Oakley.

**The Relevant Undisputed Facts**

The undisputed facts show the following:

Marty Calderon states that she is a law school graduate. She lived in the Village of Ossining at 233 Spring Street from September 23, 2005 until December 1, 2005, and thereafter at 3 Marble Place.

Ossining, like many jurisdictions in Westchester County, has long had on its books a law prohibiting on-street parking in the wee hours of the night—specifically, between 3 a.m. and 6 a.m. *See* Village Code § 250–29(B).

The "no overnight parking" rule was passed in 1988 by the Village Board of Trustees. The purpose of the law was, in part, to assist in the process of identifying abandoned vehicles and to prevent long-term storage of vehicles on the public streets. *See* Village Code § 250–29A(1). The Village Trustees specifically found that overnight on-street parking was a hindrance to a laundry list of governmental operations.

Ossining permits individuals to obtain permits, which they can display in their windshields in order to remain parked on the street throughout the night. *See* Village Code § 250–29(D). The applicant seeking a permanent exemption from the law must submit a non-refundable administrative fee to cover the cost of processing and investigating the application.

Plaintiff owns a Mercedes Benz, bearing Connecticut license plate 918TXA. She did not drive it every day, and when it was not in use, she parked the car on Spring Street, in more or less the same spot. (Pl. EBT at 37–38.)

On October 25, 2005, plaintiff was ticketed for violating the overnight parking rule. (*Id.* at 24–25).

As of October 25, 2005, signs were posted on Spring Street, advising motorists that there was no parking on Village streets between 3 and 6 AM without a valid Village Parking Permit (*Id.* at 25).

Plaintiff did not apply for a parking permit after she received her first ticket.

Plaintiff was ticketed on four additional occasions for illegal overnight parking: November 4, November 21, November 22 and November 30.

New York State's Vehicle and Traffic Law ("VTL") § 1224(c) provides that a motor vehicle shall be deemed to be abandoned if left unattended for more than 48 hours after the parking of such vehicle shall have become illegal, if left on a portion of the highway or public place on which parking is legally permitted. N.Y. Veh. & Traf. Law § 1224(c) (McKinney2006).

On or about December 14, plaintiff was ticketed for having abandoned her car. Plaintiff had parked her Mercedes in the usual spot in early December and did not thereafter move it—clearly making the car "abandoned" within the meaning of the VTL. She responded to the ticket by protesting that her car was not abandoned and by showing the police that she had title to the car.

According to a civilian complaint filed by plaintiff immediately after she received this ticket, her ignition switch was broken and needed to be fixed. (Supp.Mot.Papers, Ex. F.) However, there is no indication in the record that plaintiff caused the car to be towed or otherwise moved it to a repair shop. She simply left it on the street, while driving a second vehicle. (Id. at Ex. G.) Plaintiff admitted at her deposition that she never had the Mercedes serviced. (Pl. EBT at 18.)

On January 21, 2006, the police also placed an orange "abandoned car" sticker on her driver's side window. They did not, however, tow her car; rather, they intended to warn her that her car was in danger of being towed. Plaintiff called in yet another civilian complaint when she saw the sticker. The officer who responded to her call, Officer Zimmerman, listened to her story, told her to apply for an over-night tag, and advised her to move her vehicle to avoid further police action.

Two days later, plaintiff took half of Officer Zimmerman's advice. Plaintiff testified at her deposition that she submitted an application for an overnight parking permit on January 23, 2006, at which time she paid the $42 fee. (Pl. EBT at 51–52.) Ex. A to plaintiff's complaint (which is identical to Ex. D to the Supplemental Motion Papers) was identified at her deposition as the application that she filed on January 23, and it bears the "received" stamp dated January 23, 2006. It is thus undisputed that plaintiff did not apply for an exemption from the no overnight parking law until January 23, 2006. (I go though all of this because the application itself is dated December 14, 2005. It was not, however, submitted at that time). When she submitted her application, plaintiff was given a receipt for her payment of $42. (Supp.Mot.Papers, Ex. K.) She contends that she was handed two permit stickers to place in the rear windshield of her two vehicles. Plaintiff contends that she did so. (Pl. EBT at 60.).

Plaintiff did not take Officer Zimmerman's other piece of advice, and move the car. If indeed she placed the sticker in the rear window of the Mercedes, there would appear to have been no need for her to do so.

However, on January 25, 2006, plaintiff was again ticketed for violating the no overnight parking law. After getting Parking Administrator Claire Burton to dismiss the ticket (Pl. EBT at 63), she immediately wrote a letter to Police Chief Burton, complaining about the officer who ticketed her (Shield No. 164) and protesting that she was legally parked with her parking permit sticker in the rear windshield on the driver's side. (Supp.Mot.Papers, Ex. K.) The Chief responded that

plaintiff was within her rights to contest the ticket if she thought the summons was wrongfully issued, but in view of plaintiff's bald admission that her car had been parked on the street since the beginning of December, he advised her about the VTL law concerning abandoned cars. Chief Burton closed his letter by saying, "Due to the confusion I will advise my officers not to tow your car until after this weekend. After this time, your vehicle will be deemed abandoned and will be subject to tow at your expense." (*Id.* at Ex. J.)

On January 28, 2006, plaintiff wrote to Chief Burton, threatening to take legal action against the Village if her car were towed, claiming that she had a parking permit and again asserting that her car was not abandoned.

Plaintiff admittedly did not receive her permanent parking permit—the one for which she applied on January 23—until sometime after January 30, and before February 7, 2006. (Pl. EBT at 60.) That should have made no difference if indeed she had affixed the temporary permit to her rear window.

Plaintiff did not move her Mercedes at any time.

The car was finally towed on January 30, 2006, by defendant A & P Collision, Inc. ("A & P").

Plaintiff filed yet another civilian complaint that very day. She followed it up with this lawsuit.

**The Original Complaint**

The plaintiff's original complaint alleges that plaintiff was deprived of her property (specifically identified as the Mercedes) without due process of law. She claimed that the police had no right under any law to tow her car and were instead engaged in a conspiracy to deprive her of the use and enjoyment of her Mercedes, which she needed to drive in order to obtain employ-

ment. She claimed that defendants wanted to deprive her of the Mercedes because it was "of value to the Plaintiff and of value to the general public in that people admired it and it was worth value." (Cplt.¶ 45.) Plaintiff further alleges that the car was damaged when it was towed, because the emergency brake was on, and that this rendered the car worthless because she was financially unable to repair the car. And she asserts that the Village has a practice of towing cars whose owners cannot afford to retrieve them, which enables the Village Trustees to keep the proceeds from those vehicles (presumably, when they are sold).

The complaint contains generalized allegations that plaintiff's right to equal protection was violated in that her car was targeted by the police because she was a Hispanic woman. The complaint also alleges a claim under New York State law for intentional infliction of emotional distress. (*Id.* at ¶ 63.) She asserts a claim for "retaliation [for her pleas of not guilty to the tickets] and attempting to obstruct plaintiff from testifying in future trials." And she asserts a claim for breach of contract (the contract being her parking permit, for which she applied), unfair trade practices and unjust enrichment.

Plaintiff seeks money damages (compensatory and punitive) and an injunction against further harassment.

The individual Ossining Defendants— Chief Burton, Mayor Napolitano and the members of the Village Board of Trustees—moved against the original complaint for summary judgment on the ground of qualified immunity.

**The Proposed Amended Complaint**

The amended complaint that plaintiff sought to file after the Ossining defendants moved for summary judgment on the ground of qualified immunity is essen-

tially the same as the original complaint, but it contains an additional factual detail that is worth mentioning: Plaintiff paid $75 to Ray Oakley of A & P to retrieve her Mercedes after it was towed, and another $50 so that Oakley would tow the vehicle to the repair shop. This took place on January 31, the day after the car was towed. (Am.Cplt.¶¶ 27–28). The Amended Complaint also contains considerably more detail about the damage to plaintiff's car—including allegations that A & P towed the car while the emergency brake was engaged, thereby causing it to be damaged—but does not expand on the facts about what occurred between November 1, 2005 and January 30, 2006.

Plaintiff seeks leave to amend her complaint in the following ways: to amend her First Amendment retaliation claim by alleging that the car was towed on January 30 in retaliation for the fact that she filed civilian complaints against the police and threatened legal action against the Village; to assert a separate claim for discrimination on the ground that she is Hispanic (presumably under Section 1981, which is referenced in the Amended Complaint at ¶ 6); and to assert a claim for conversion.

In the amended complaint, as in the original complaint, all claims are asserted against all defendants.

## Plaintiff's Cross Motion for Default Judgment

Plaintiff has also moved for a default judgment against A & P and Ray Oakley, against whom she asserts various state law claims. Plaintiff does not specifically allege that these parties were acting under color of state law when they towed her car, but she also purports to assert her federal constitutional claims against A & P and Oakley as well.

## The Ossining Defendants' Qualified Immunity Motion

The individual Ossining defendants moved to dismiss the original complaint on the ground of qualified immunity. Since the factual allegations concerning the period prior to the time the car was finally towed are identical in both complaints, it stands to reason that if the Ossining Defendants are entitled to qualified immunity under the first complaint, it would be futile to permit plaintiff to file her amended complaint—at least insofar as it alleges federal causes of action.

■ Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Deciding to ticket a car, or to tow it for a violation of law, is a discretionary act within a police officer's official capacity. *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). An officer who decides to ticket or tow a car without any basis for doing so is entitled to qualified immunity if officers of reasonable competence in the same circumstances and with the same knowledge could disagree whether probable cause existed. *See Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir.1997); *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3041. This mistaken but objectively reasonable belief is analogous to "arguable probable cause" in the context of false arrest. *See, e.g., Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir.2001); *Coons v. Casabella*, 284 F.3d 437, 440 (2d Cir.2002); 1A Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims and Defenses* § 3.21 (3d ed.1997).

Thus, a ticketing or towing officer is entitled to summary judgment on qualified

immunity grounds if, from the view of the record most favorable to the plaintiff, a jury could conclude that arguable probable cause to ticket or tow the car existed. *See Cerrone*, 246 F.3d at 202; *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

Clearly, no officer committed any constitutional violation by ticketing plaintiff's car prior to January 23. The relevant facts are undisputed. Plaintiff by her own admission parked her car on the street in violation of the no overnight parking law without having any sort of permit. The Village was perfectly within its rights to decree that no cars should be parked on the Village streets during the early morning hours, and New York State law clearly provides that cars that remain parked for two or more days after having been parked illegally—which plaintiff was, every single day between December 1 and January 23, during the hours of 3 AM to 6 AM—are deemed "abandoned," regardless of plaintiff's opinion that her car was not abandoned. No resort to qualified immunity is necessary to shield the actions of the Chief of Police (the only police defendant) prior to that date.

■ From and after January 23, the facts cease to be undisputed, and for purposes of this motion I must accept plaintiff's version of the facts to be true. Plaintiff claims that she received temporary parking stickers for her two cars on January 23, and that she affixed them to her rear windshields on that date—allegations that I must assume to be true for purposes of this motion. If these claims are true, then no reasonable police officer could have thought he was acting appropriately by ticketing plaintiff's car on January 25 or by directing that the car be towed as an abandoned vehicle on January 30.

But of course the officer who issued the January 25 ticket is not a defendant in this case—the only police officer who was sued is Chief Burton. He is not entitled to qualified immunity for any federal constitutional claim arising out of the January 25 ticket—he is entitled to outright dismissal, because neither the complaint nor the amended complaint alleges any fact tending to show that Chief Burton directed the ticketing officer to ticket the car on that date. An individual defendant cannot be liable under Section 1983 for actions in which he did not personally participate. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994); *Atkins v. County of Orange*, 372 F.Supp.2d 377, 399 (S.D.N.Y.2005).

■ Chief Burton did, however, clearly indicate in his letter of January 26 (Supp.Mot.Papers, Ex. J) that he would deem the car abandoned and have it towed "after this weekend." In an affidavit (which is technically not to be considered in connection with a motion for qualified immunity), the Chief states that he told his officers to "provide plaintiff the weekend to move her vehicle." (Burton Aff. at ¶ 9) It could be that the officers were expressly told to tow the car if it was not moved after the weekend. Or it could be (based on the affidavit from the Chief, which I may not consider at this point in the lawsuit) that the Chief said nothing to his officers beyond telling them not to tow the car until after the weekend, but that his statement fairly implied that they were to get the car off the street if it was still there after the weekend. A third possibility is that the officers themselves made the decision to tow the car, without any input from the chief. Since the plaintiff is entitled to all inferences in her favor at this stage of the proceedings, I must assume that the facts will bear out one of the first two possibilities.

Unfortunately for Chief Burton, the car could not be deemed abandoned and towed if there was a parking permit, temporary

or permanent, affixed to the rear window, because it was legally parked. Plaintiff alleges and testified that there was a temporary permit in her rear window. The record reveals that she apprised Chief Burton that her car had a temporary sticker in the rear window in her letters of January 25 and 28, 2006 (Supp.Mot.Papers, Ex. K). No reasonable police officer who knew that there was an overnight parking permit affixed to a car's rear window could have believed that he was authorized to allow his officers to tow that car as abandoned within the meaning of the VTL. Until the facts are fully sorted out, it is not possible to determine whether the Chief is entitled to dismissal because no constitutional violation occurred, but at this point—assuming plaintiff's version of events to be true—he is not entitled to qualified immunity as a matter of law.

Therefore, Chief Burton's motion for qualified immunity is denied. The lawsuit will proceed against him—although I rather imagine that he will move for summary judgment at the close of discovery.

I grant plaintiff leave to file an amended complaint as against Chief Burton—but not the amended complaint she proposed to file. Plaintiff, who claims to have graduated from law school, should carefully delineate each separate claim that she asserts against the chief. She should not conflate him with any other defendants who remain in this action. And she should not assert claims against him that are not properly asserted against him, including claims that the court has already dismissed. Her only viable claim against Chief Burton is for expressly or by implication ordering the towing of her car after she advised the Chief that she already had a parking permit (albeit a temporary parking permit).

The reason why the other individual Ossining defendants moved for dismissal on the ground of qualified immunity is unfathomable.[1] The court has reviewed the complaint and the amended complaint, and neither one alleged any viable cause of action, under federal or state law, against the Mayor and Trustees of the Village of Ossining. They are not alleged to have been in any way involved in the events of November 2005 through January 2006. Plaintiff's conclusory allegation that the "Village" has a "practice" of ticketing the cars of the poor, so that the Trustees can keep the proceeds derived from the sale of those cars when their owners cannot reclaim them, is not supported by the pleading of a single fact tending to support the existence of such a policy. Moreover, plaintiff lacks standing to bring such a claim in view of the fact (as alleged in her proposed amended complaint) that she retrieved her car from the towing service the day after it was towed. Moreover, no facts are pleaded or testified to by plaintiff that would give rise to any *Monell* or *Pembauer* claim against the Village of Ossining. Plaintiff's unfortunate habit of lumping the defendants together and alleging that they are all responsible for anything bad that happened to her does not suffice to salvage the pleading.

The *pro se* complaint against the Village of Ossining, its mayor and its Trustees is thus dismissed by the court *sua sponte* for failure to state any claim against those defendants; and plaintiff's motion for leave to file an amended complaint as against those defendants is denied for the same reason: amendment would be futile be-

---

1. The fact that the court's rules require qualified immunity motions to be made at the beginning of the lawsuit neither compels individual defendants who do not have grounds to claim qualified immunity from doing so nor prohibits defendants against whom absolutely nothing is alleged from moving to dismiss on that ground.

cause the amended complaint, like the original complaint, fails to state any viable cause of action against any of them.

## Motion for Default Judgment Against Non–Ossining Defendants

■ This leaves plaintiff's motion for a default judgment against the non-Ossining defendants, A & P and Ray Oakley, who have never appeared in this action. Plaintiff seeks to recover against them for damaging her car by towing it while the emergency brake was on.

The court may enter a default judgment against a party defendant who has not appeared in an action. Fed.R.Civ.P. 55(b)(2). However, even when a party fails to appear, the plaintiff does not enjoy an automatic right to entry of judgment; when an application is made to the court for entry of a default judgment, the court must exercise sound discretion in determining whether the judgment should enter.

The situation surrounding service of process on these defendants at first appeared somewhat murky. Entries 37 and 38 on the docket sheet are for the filing of affidavits of service of a summons and complaint against A & P and Ray Oakley. Service was allegedly made on May 19, 2006. According to the affidavits of service (which the court has reviewed), a process server named Allen W. Gantz personally delivered the summons and complaint to Oakley, both individually and in his capacity as an officer of the corporation. Plaintiff made her motion for a default judgment on June 19, 2006, and served the same by mail on the defendants. (*See* Docket Entry 40.)

It does appear that the United States Marshals Service—which served the other defendants—attempted to serve these defendants as well, first by mail (on March 29) and then by hand delivery. (*See* Docket Entries 43–44.) I assume this was done because plaintiff was granted *in forma pauperis* status. However, neither defendant was served. The Marshal notes in the docket entry that he "could not locate" the address given by the plaintiff for A & P and Oakley (which, on the civil cover sheet, is listed as 29 North Water Street, Ossining, New York). The address at which the process server effected service is 29 Water Street (not "North"), Ossining, New York

The failure of the Marshal to serve, however, turns out to be irrelevant. The defendants were, however, properly served by a non-party to the action, as required by Rule 4(c)(2). A & P and Oakley have not appeared and are clearly in default.[2] Moreover, they have not appeared in response to the default judgment motion, which was also served on them by mail.

There is nonetheless a good reason for this court, in an exercise of its discretion, to decline to enter a default judgment against these defendants at this time on the federal claims that are asserted against them.

These two defendants are private parties. As noted above, plaintiff does not expressly allege that these defendants were state actors. Absent such an allegation, no federal claim lies against them.

While plaintiff purports to be a law school graduate, she is proceeding *pro se*

---

2. The Clerk of the Court records that "all defendants" appeared by counsel and moved for summary judgment on qualified immunity grounds. Obviously, that is an error on the part of the Clerk's Office, occasioned by counsel's loose use of the word "defendants" on his original motion papers; the Supplemental Submission makes it quite clear that Mr. Swenson was appearing only on behalf of the Ossining Defendants. I will overlook this administrative error.

and her complaint is extremely unsophisticated, so I will analyze the facts it as though it were filed by a true *pro se* plaintiff (i.e., one not schooled in the law) to see if the facts alleged bring A & P and Oakley within the limited exception that permits private parties to be sued as state actors—that is, whether their conduct in towing the car with the emergency brake engaged is "fairly attributable to the state."

Determination of state action is highly fact-specific. The instant case, however, appears to be a classic example of one in which a private party cannot be deemed to be a state actor. While I assume that A & P had a contract with the Village to provide towing services at the behest of the Village (no such contract is pleaded, but I am bending over backwards for plaintiff), there is no indication that the Village had any proprietary interest in A & P—a factor deemed significant by the Second Circuit Court of Appeals in determining whether there exists a symbiotic relationship between the state and a private party. *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1082 (2d Cir.1990), *cert. denied*, 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991). No facts are alleged tending to suggest that the Village derived any profit from A & P's towing of cars. Numerous cases hold that companies that provide services to municipalities pursuant to contracts are not thereby transformed into state actors—at least where, as here, the function performed (towing cars) has not been historically, traditionally and exclusively the prerogative of the state. *Rendell–Baker v. Kohn*, 457 U.S. 830, 840–41, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Black by Black v. Indiana Area School Dist.*, 985 F.2d 707, 711 (3d Cir.1993).

Moreover, no facts are alleged here tending to show that the Village in any way regulated, or even had any say in, the manner in which A & P chose to tow cars. It is the manner of the towing—with the emergency brake engaged—that allegedly caused the extensive damage to plaintiff's automobile.

However, since I am granting a default judgment on two of plaintiff's state law claims and directing the Magistrate Judge to hold an inquest, I will also exercise my discretion pursuant to Fed.R.Civ.P. 55(b) and direct the learned Chief Magistrate to hold a hearing on the issue of state action and to prepare a report and recommendation to the court on this issue. If the evidence demonstrates that A & P's relationship with the Village of Ossining does not rise to the level necessary to transform it into a state actor, I will simply dismiss the federal claims against A & P and Oakley. (Or it may be that plaintiff will decide not to pursue her federal claims, because she can obtain all the relief to which she is entitled under her state law claims).

The remaining claims are the state law claims for conversion, negligence resulting in damage to the car, and intentional infliction of emotional distress. Because this court has original jurisdiction by virtue of the federal claims against Chief Burton, the court has supplemental jurisdiction over these claims, even though Oakley and A & P are "pendent parties" to the action. 28 U.S.C. § 1367(a). And because I have not dismissed the federal claims against Chief Burton, I cannot avail myself of § 1367(c)(3) to dismiss these purely state law claims brought against parties who are not proper defendants on the federal claims.

I decline to enter a default judgment on the claim for intentional infliction of emotional distress, because the facts alleged in

the complaint do not give rise to any such claim, against any person. Intentional infliction of emotional distress is a highly disfavored cause of action in New York; it is reserved for actions far more egregious than towing a car while the emergency brake is engaged. I dismiss this claim *sua sponte.*

However, because defendants were served and failed to appear, I grant plaintiff's motion for a default judgment against A & P and Ray Oakley on her claims for conversion and negligence resulting in damage to the car. The matter is set down for an inquest before the assigned Magistrate Judge, The Hon Lisa Margaret Smith. The plaintiff should contact Judge Smith's chambers to ascertain the procedure for noticing the inquest.

This constitutes the decision and order of the court.